UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


CORY J. TAYLOR,

                Plaintiff,

        v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,[1]

             Defendant.

Case No. 3:12-cv-02079-ST

OPINION AND ORDER


STEWART, Magistrate Judge:


## INTRODUCTION

Plaintiff, Cory J. Taylor ("Taylor"), seeks judicial review of a final decision by the

Acting Commissioner of Social Security ("Commissioner") denying his applications for

Disability Insurance Benefits ("DIB") under Title II and Supplemental Security Income ("SSI")

under Title XVI of the Social Security Act ("Act"), 42 USC §§ 401-33.  This court has

jurisdiction pursuant to 42 USC § 405(g).  All parties have consented to allow a Magistrate

Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to FRCP 25(d), Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this case.

§ 636(c).  For the reasons set forth below, the Commissioner's decision is reversed, and this case is remanded for an immediate award of benefits.

## ADMINISTRATIVE HISTORY

Taylor protectively filed for DIB on August 30, 2005, alleging a disability onset date of July 23, 2004.[2]  Tr. 45-46, 73-75.[3]  After his application was denied both initially and on reconsideration, Taylor requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 47-59.  On February 13, 2008, Administrative Law Judge ("ALJ") Thomas P. Tielens held a hearing at which Taylor and a Vocational Expert ("VE") testified.  Tr. 18-44.  On March 27, 2008, the ALJ issued a decision finding Taylor not disabled within the meaning of the Act. Tr. 6-17.  On March 19, 2009, the Appeals Council denied Taylor's request for review.  Tr. 1-3.

Meanwhile, on July 23, 2008, Taylor protectively filed a second application for DIB as well as an application for SSI, alleging an onset date of June 1, 2003.  Tr. 466-67, 598-601. After these claims were also denied both initially and on reconsideration, Taylor requested a hearing.  Tr. 509-29.

On May 21, 2009, Taylor filed an action in this court to reverse ALJ's Tielens's decision, *Taylor v. Astrue*, Case No. 3:09-cv-560-MO.  On March 30, 2010, based on the stipulation of the parties (Tr. 447-49), Judge Mosman issued an Order of Remand instructing the ALJ to hold a *de novo* hearing and:

> (1) update the medical record with existing evidence to further clarify the severity of Plaintiff's physical and mental impairments, to include medical source statements; (2) reevaluate all the medical source opinions of record; (3) reevaluate the lay witness statement from Denise Paulus; (4) reevaluate Plaintiff's credibility;

---

[2]  The Application alleges a disability onset date of July 23, 2003.  Tr. 73.  However, the Disability Determination and Transmittal forms denying the applications both initially and on reconsideration recorded the alleged onset date as July 23, 2004.  Tr. 45-46.  Taylor concedes that his disability onset date is July 23, 2004, the date of his car accident.  Tr. 420-21.

[3]  Citations are to the page(s) indicated in the official transcript of record filed on April 4, 2013 (docket #12).

(5) reevaluate Plaintiff's residual functional capacity; (6) obtain supplemental vocational expert testimony if necessary; and (8) complete the sequential evaluation process.

Tr. 445-46.

On August 24, 2010, the Appeals Council vacated ALJ Tielens's decision and remanded the case to combine Taylor's claims and issue a new decision. Tr. 440-44.

On December 1, 2010, ALJ Steve Lynch held a second hearing at which Taylor testified, as did a Medical Expert ("ME") and a VE. Tr. 410-39. On December 20, 2010, the ALJ issued a decision finding Taylor not disabled within the meaning of the Act. Tr. 376-90. On September 27, 2012, the Appeals Council denied Taylor's request for review, making ALJ Lynch's decision the final decision of the Commissioner. Tr. 351-54; 20 CFR §§ 404.981, 416.1481.

## BACKGROUND

Taylor was 35 years old at the time of his alleged onset date and 41 years old at the time of his second hearing. He attended high school but has had no additional schooling or training since then. Tr. 22. He has past relevant work as a donation driver, moving van helper, and journeyman baker. Tr. 388. Taylor alleges that he became unable to work on July 23, 2004, due to degenerative disc disease of the lumbar and sacral spine with lumbar scoliosis, pain disorder due to his physical conditions, major depressive disorder, and anxiety disorder with panic attacks.

## DISABILITY ANALYSIS

In construing an initial disability determination, the Commissioner engages in a five-step sequential process. 20 CFR §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 US 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled. 20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12–month durational requirement.  20 CFR §§ 404.1520(a)(4)(ii), 416.909, 416.920(a)(4)(ii).  Absent a severe impairment, the claimant is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); 20 CFR Pt. 404, Subpt P, App 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.  20 CFR §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96–8p, *available at* 1996 WL 374184.

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.  20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant cannot do so, then at step five, the ALJ must determine if the claimant can perform other work in the national economy.  20 CFR §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999).

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at 1098.  If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC.  *Id.*  If the Commissioner meets this burden, then the claimant is not disabled.  20 CFR §§ 404.1566, 416.966.

## ALJ'S FINDINGS

At step one, the ALJ found that Taylor has not engaged in substantial gainful activity since the alleged onset date of disability.[4]  Tr. 381.  At step two, the ALJ determined that Taylor suffered from the severe impairments of degenerative disc disease of the lumbar and thoracic spine, major depressive disorder, and anxiety disorder (with panic attacks).  Tr. 382.  At step three, the ALJ found that Taylor's impairments, either singly or in combination, did not meet or equal the requirements of a listed impairment.  *Id.*

To evaluate how his impairments affected his ability to work, the ALJ concluded that Taylor had the RFC to perform light work, except that he can:  "lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk six hours total in an eight-hour day; sit six hours total in an eight-hour day . . . occasionally climb ramps and stairs; occasionally crawl, crouch, stoop, and kneel; occasionally reach overhead;" but should "never climb ladders, ropes, or scaffolds; . . . perform no more than frequent fine manipulation with the hands; perform no more than frequent gross manipulation with the hands;" should "avoid concentrated exposure to noxious fumes and odors; avoid work around hazardous machinery; perform only simply, entry-level work;" and "should have no interaction with the general public, and only routine, social interaction with co-workers."  Tr. 383-84.

At step four, the ALJ found that Taylor was unable to perform any past relevant work as a donation driver, moving van helper, or a journeyman baker.  Tr. 388.  However, at step five, the ALJ found that Taylor was not disabled because he could perform other jobs as a hand packager or a production assembler.  Tr. 388-89.

///

///

---

[4] The ALJ listed the alleged onset date as June 1, 2003.  Tr. 380.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on the proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004).  The court must weigh the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998).  The reviewing court may not substitute its judgment for that of the Commissioner.  *Id*, citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading.  *Lingenfelter*, 504 F3d at 1035; *Batson*, 359 F3d at 1193.

It is appropriate under the regulations for the Commissioner to render a new, independent decision after a remand from federal court.  *See* 20 CFR § 416.1483-1484.  However, when the district court remands a case with instructions, the Commissioner may not disregard the court's order.  "Deviation from the court's remand order in the subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review."  *Sullivan v. Hudson*, 490 US 877, 886 (1989).

## DISCUSSION

### I.    Factual and Medical Background

Only July 23, 2004, Taylor's car was rear-ended while stopped at an intersection.  Tr. 191-92, 421.  Immediately after the accident, Taylor felt discomfort in his shoulders.  Tr. 192.  On August 19, 2004, Taylor was examined by his primary care physician at Kaiser Permanente, Steven Levine, MD, MTS, who prescribed Flexeril for the pain and referred him for

chiropractic treatment.  Tr. 178, 209.  On August 30, 2004, Taylor established care with Theresa

M. King, DC, PC, at Creston Chiropractic Clinic, after the pain in his neck had "progressively

worsened."  Tr. 178, 191.  On September 9, 2004, Dr. King restricted Taylor to "light duty only"

and no lifting, pulling, and pushing more than 15 pounds.  Tr. 183.  From October 18 through

December 15, 2004, she excused Taylor from lifting, pushing, or pulling more than 25 pounds.

Tr. 179-82.

Based on a scanogram and an X-ray of Taylor's lumbar spine at the L4-5 level in

November 2004, Maribel Bierberach, MD, concluded that Taylor had mild lumbar scoliosis and

that his right leg was about 8 mm shorter than his left.  Tr. 207-08.  The X-ray also showed that

Taylor had advanced facet degenerative changes at the lumbrosacral level (L4-S1) on the right

side of his spine and to a lesser extent on the left.  Tr. 207.

On June 20, 2005, Taylor reported improvement in his neck and upper back pain, but new

pain in his lower back that was interfering with his daily routine.  Tr. 205-06.  He felt the weekly

massage and chiropractic treatments had contributed to this improvement.  *Id.*  When

Dr. Bierberach did not have time to examine his new complaint, Taylor appeared "very upset"

that his time had been wasted.  Tr. 206.

Over the course of his chiropractic treatment, Taylor's symptoms did not stabilize or

improve to his pre-accident status.  Tr. 162.  On July 28, 2005, Dr. King referred Taylor to New

Heights Integrative Therapy where he was assessed as having "severe limitations in his spinal

mobility, severe irritability of his lumbar spine with activity, and severe weakness of his spinal

stabilizers grossly."  Tr. 201.  However, he was unable to continue treatment because the clinic

was not approved by Kaiser.  *Id.*

Taylor returned to Dr. Levine on September 7, 2005, complaining that his low back pain had not improved and that additional right sciatica symptoms were very painful at times. Tr. 204. Dr. Levine noted Taylor was not in "acute distress" and opined that his pain was related to the motor vehicle accident. Tr. 205. Dr. Levine prescribed Hydrocodone, and Taylor declined local injections as a pain treatment. *Id.* Dr. Levine also referred Taylor back to Dr. King for more chiropractic treatment, which Taylor followed. Tr. 205, 243. On February 8, 2006, Taylor reported improvement from the previous treatment and rated his upper back pain as 5 out of 10 after doing yard work with a lumbar support belt. Tr. 243. At some point during this second round of treatment, Taylor began receiving spinal injections for the pain. *Id.*

On February 24, 2006, Taylor returned to Dr. Levine explaining that chiropractic treatments provided pain relief for a week before his symptoms returned with the "slightest" forward bend. Tr. 312. His pain had advanced to bilateral leg pain, with greater pain in his right leg. *Id.* Taylor said he felt depressed on the days "his pain is bad," but refused mental health counseling or antidepressant medication. *Id.* Dr. Levine prescribed Percocet, ordered a MRI of Taylor's lumbar spine, and referred him to physical therapy. Tr. 312-13.

On March 29, 2006, Paul O. Jacobs, MD, reviewed Taylor's lumbar MRI which showed "a very slight listhesis forward of L5 on the sacrum and that there is desiccation of the L5-S1 disk. There is quite a significant degree of degenerative change in the right lumbosacral joint and the left is much less involved." Tr. 1217. Dr. Jacobs observed that Taylor did not exhibit pain behavior during his interview, but was "very slow moving and he tends to groan with any exam movements" and "exhibited pain behavior with resisted leg strength testing" and bending forward. Tr. 1216. Dr. Jacobs assessed Taylor with a "remote lumbar spine injury apparently related to his work" and "arthritis at the lumbosacral junction." Tr. 1217. He explained to

Taylor that "his degree of pain and his degree of impairment of his function are not particularly consistent with the changes in his cervical, thoracic, and lumbar spine" and that "he was evidencing a good example of someone whose activity level was suffering because of their pain." *Id.* As treatment, Dr. Jacobs recommended that Taylor discontinue chiropractic treatments and prescribed a "self-directed physical rehabilitation program with stretching, exercise, and progressive building of his strength." *Id.*

On April 14, 2006, Dr. Levine noted that since taking Prozac three weeks earlier, Taylor felt less depressed, had lost 14 pounds, and was more active by doing yard work and walking daily. Tr. 1097. However, on May 17, 2006, Dr. Jacobs observed "[g]eneral deconditioning and pain related impairment of activity level" and administered a spinal injection. Tr. 1215. Taylor continued to receive treatment from various Kaiser doctors throughout 2006 and into early 2007, including spinal injections for his pain. Tr. 1055-1102.

Taylor worked from December 26, 2006, to March 17, 2007, at a machine shop. Tr. 22, 605. However, he quit after missing work because he "couldn't handle the jarring on the concrete floor." Tr. 23. In May 2007, Taylor mowed lawns for three to four weeks to earn money, but stopped after his low back began "locking up" and his right leg went numb. Tr. 27-28, 1052.

On May 2, 2007, Dr. Jacobs reported that Taylor "manages his pain using flexeril and almost daily [P]ercocet and has been on a contract with Dr[.] Levine but hasn[']t gotten refills since January." Tr. 1052. On August 6, 2007, Dr. Levine noted that Taylor drank approximately eight beers per day, but only when not taking Percocet. Tr. 1048. Dr. Levine added "alcohol abuse" to Taylor's list of problems and referred him to the addictionology department for an

opiate therapy plan.  Tr. 1049-50.  On October 8, 2007, Dr. Jacobs noted that Taylor continued to be overweight.  Tr. 1046.

On January 3, 2008, Taylor complained to Dr. Levine of chronic foot, leg, and low back pain and sought his opinion on using medical marijuana.  Tr. 1041.  Dr. Levine "strongly advised against" it and told Taylor that most of his problems would improve with "considerable" weight loss and a healthy diet and exercise plan.  Tr. 1042.  On January 31, 2008, Taylor had another MRI of his lumbar spine.  Tr. 1039, 1231 (MRI).

On February 21, 2008, after Dr. Jacobs retired, Christina Y. Lee, MD, became Taylor's treating physician in the psychiatry department at Kaiser.  Tr. 1020, 1041.  Taylor described his pain as increasing with any prolonged standing or walking or sitting, but that "changing his position frequently helps with the pain."  Id.  At the time, he was still taking Flexeril and Percocet "only once in awhile" for the pain.  Tr. 1020-21.  On March 13, 2008, Dr. Lee administered an electrodiagnostic examination of Taylor's right leg but found no evidence of an active radiculopathy.  Tr. 1017.

In November 2008, Taylor had surgery to repair a tendon on his left foot.  Tr. 858-61.  On January 9, 2009, Taylor reported to Keith H. Griffin, MD, that he had been feeling more depressed lately because of his chronic pain and immobility following his foot surgery.  Tr. 883.  Dr. Griffin prescribed Paxil.  Id.  At the next appointment on April 23, 2009, Dr. Griffen noted a "strong odor on his breath" although Taylor denied regular alcohol consumption.  Tr. 838.  Taylor described himself as "irritable" and "tearful a great deal."  Id.

On June 2, 2009, Taylor became verbally abusive with Dr. Levine.  Tr. 816.  Dr. Levine observed "the definite smell of alcohol in the exam room," although Taylor claimed "he'd used the alcohol sanitizer in the exam room and that the smell was from that."  Id.  Dr. Levine

terminated the visit and requested that Taylor seek a new primary care physician. *Id.* Later that day, Taylor began treatment with Ben D. Wachsmuth, MD. Tr. 811-12.

On September 24, 2009, Taylor again complained about low back and right leg pain, as well as increased pain in left leg. Tr. 765-66. Because he was taking five [P]ercocet per day for pain, Dr. Wachsmuth prescribed a Fentanyl patch to "wean off Percocet as much as possible." Tr. 765, 767. On November 3, 2009, Dr. Lee examined Taylor and reported his condition had worsened with "considerably diminished [range of motion] of the lumbar spine." Tr. 749. She referred him to physical therapy. *Id.*

On December 31, 2009, Dr. Wachsmuth expressed concern about Taylor's adherence to his treatment plan. Tr. 734. Taylor had not scheduled a physical therapy appointment and had stopped using the prescribed Fentanyl patch because he did not like its effect. *Id.*

However, on January 7, 2010, Taylor resumed physical therapy. Tr. 729. During January 2010, Taylor reported constant low back pain which increased with prolonged standing or walking. Tr. 720-32. Therapeutic exercises and a TENS unit proved helpful, but as of January 28, 2010, Taylor was still "very weak and having increased pain with most motions." Tr. 720-21. The last physical therapy record dated March 10, 2010, assessed his progress as "[v]ery slow changes." Tr. 957-58. On March 30, 2010, Dr. Wachsmuth prescribed a basic opiate therapy plan for Taylor. Tr. 966-69.

## II.    **Lay Testimony**

Taylor first argues that the ALJ erred in evaluating his credibility and rejecting the testimony of his former girlfriend and roommate, Denise Paulus ("Paulus"), and his parents, Frances and R.C. Taylor.

///

A.    **Denise Paulus**

Paulus's testimony consists of a third-party function report dated October 8, 2005

(Tr. 105-12), and a written statement dated March 6, 2010.  Tr. 699-701.  She and Taylor met in

December 1994 and began living together in March 1995.  Tr. 699.

In 2005, Paulus reported that while she was at work, Taylor cared for her father by

preparing meals and administering his medicine.  Tr. 105-06.  However, Taylor was restricted to

making small meals that did not require a long standing period and cooked less often than before

his accident.  Tr. 107.  Taylor also helped care for two dogs, but could not walk them due to

substantial pain.  Tr. 106.

Paulus also stated that Taylor helped with dishwashing and light laundry about three

times a week.  Tr. 107.  He left the house daily but would travel by car.  Tr. 108.  However,

Taylor seldom shopped for food and only when Paulus was unavailable.  *Id.*

Taylor also wrote that that Taylor's back pain often woke him up at night and caused him

to lose sleep.  Tr. 106.  Although fishing was one of Taylor's favorite pastimes, along with other

outdoor activities, Paulus testified that he "never" went because of his back pain.  Tr. 109.

Taylor did, however, continue to play cards once a week with friends.  *Id.*  Other than card

games, Taylor's only other regular activity was attending medical appointments.  *Id.*

Paulus described Taylor's mood as often irritable because of his pain.  Tr. 110.  Taylor no

longer enjoyed socializing since his accident because it was uncomfortable for him to sit or

stand.  *Id.*  Taylor did not get along with authority figures or handle stress well and was "almost

always angry, upset or even crying."  Tr. 111.

Paulus noted that Taylor "[c]an only lift 10 lbs and cannot lift anything repetitively.  It is

painful for him to bend, reach, squat, kneel and even to walk.  We used to take long walks, now

we don't because it is too painful . . . ." Tr. 110.  He could only walk four blocks before needing a rest, according to Paulus, "depend[ing] on how much pain he is in.  Sometimes he needs to wait awhile before he is able to continue."  *Id.*  Taylor has no difficulty following written instructions but can only remember spoken instructions and pay attention for "short periods of time."  *Id.*

By 2010, Paulus and Taylor were engaged but, after living together for 14 years, had separated.  Tr. 699.  They still continued to talk "on the phone several times a day" and see each other "at least a couple of times a week."  *Id.*  Paulus felt "Cory's emotional and physical health issues contributed to our recent separation."  *Id.*

Paulus had witnessed a "substantial decline in both his physical and emotion[al] well being."  *Id.*  Taylor experienced a "great deal of pain in his back, arms, and feet on a regular basis," which she observed when he suffered "stabbing pains in his feet" and "almost collapse[d] due to the degenerative condition in his back."  *Id.*  Because of his pain, he only slept a few hours a night and could not perform "even simple tasks."  Tr. 699-700.  He was still not able to walk far and now used a cane when walking outside.  *Id.*  During a February 2010 trip, he "was not able to walk very far without showing that he was visibly in pain.  I could tell by the wincing on his face and the tears in his eyes that he was hurting."  *Id.*  They ended the trip early because he "was in a great deal of pain."  *Id.*

Paulus described Taylor when they first met as being "very energetic" and "helping his parents and grandparents with chores that they were not able to do on their own."  *Id.*  But by March 2010, Taylor felt hopeless and that "everyone would be better off without him" as "he was a burden to his friends and family."  Tr. 700.  Taylor regularly showed signs of anxiety with

pain in his chest and difficulty breathing, and was becoming increasingly angry and frustrated.
*Id.*

    **B.**    **Frances and R.C. Taylor**

    Taylor's parents submitted a written statement dated March 9, 2010.  Tr. 702-04.  Taylor
had been living with his parents since November 2009 and talked with his mother "at great
lengths about his health and how the pain has effected [*sic*] him."  Tr. 703.  His parents described
Taylor as the type of person who hesitates to complain about physical pain.  Tr. 702.  But since
his car accident, he "has complained about his lower back hurting him whenever he bent over or
tried to lift anything."  *Id.*  His mother recounted a shopping trip with Taylor when she realized
that "any kind of walking for any period of time makes him also sick to his stomach and he
sweats like he just stepped out of a shower."  *Id.*  When asked if he was okay, "he said his back
was killing him and he needed to sit down.  He looked like he was ready to pass out."  *Id.*
During that episode, Taylor told his mother "this is what his life is like all the time."  *Id.*  In their
house, his parents "hear his [moaning] when he has gone to bed and have heard him cry behind
his closed bedroom door."  Tr. 703.

    Taylor's ankles "turn out" and his mother thought he broke them at one point."  Tr. 702.
Taylor "wears braces on both feet for ankle support and has the pain of walking with them and
without."  Tr. 703.  "He walks with a limp now and his hands now go to sleep and he drops
stuff."  *Id.*  Taylor's parents testified to having seen him "fall walking on uneven ground and
crawl to pull himself up."  Tr. 704.

    Taylor's mother has seen Taylor throw up from the medicine prescribed by his doctors
and "walk around like some kind of a zombie."  Tr. 703.  Taylor's parents compare his
movement to "watching a man in his 90s trying to move."  Tr. 704.

C.    **Analysis**

After summarizing Paulus's 2005 and 2010 testimony, the ALJ rejected it, stating:

> These statements [by Paulus] are considered credible to the extent
> reports of what has been seen and heard are accurate.  However,
> objective medical evidence from treating providers does not
> support the degree of alleged limitation.  Ms. Paulus's statements
> receive minimal weight.

Tr. 388.

The ALJ discussed the testimony of Taylor's parents to a lesser extent and gave it "only minimal weight because little objective medical evidence supports their statements."  *Id.*

To reject lay witness testimony, the ALJ "must give reasons that are germane to each witness."  *Molina v. Astrue*, 674 F3d 1104, 1114 (9th Cir 2012), citing *Dodrill v. Shalala*, 12 F3d 915, 919 (9th Cir 1993).  Taylor argues that the ALJ gave only one reason for dismissing the lay testimony, namely that it was not supported by the objective medical evidence, which is not a germane reason.  Under Ninth Circuit law, the ALJ may not "discredit . . . lay testimony as not supported by medical evidence in the record."  *Bruce v. Astrue*, 557 F3d 1113, 1116 (9th Cir 2009), citing *Smolen v. Chater*, 80 F3d 1273, 1289 (9th Cir 1996) (alteration and emphasis in original) ("The rejection of the testimony of [the claimant's] family members because [the claimant's] medical records did not corroborate her fatigue and pain violates SSR 88–13, which directs the ALJ to consider the testimony of lay witnesses where the claimant's alleged symptoms are *unsupported* by her medical records.").

In response, the Commissioner characterizes the ALJ's use of the word "support" twice to reject the lay testimony as a finding based on contradictory medical evidence.  Inconsistency with medical evidence is a germane reason to reject lay testimony.  *Bayliss v. Barnhart*, 427 F3d 1211, 1218 (9th Cir 2009).  The issue is whether it is reasonable to infer that the ALJ discredited

the lay testimony based on contradictory medical evidence, rather than on a lack of supporting medical evidence.

The ALJ addressed the lay testimony immediately after discussing three RFC forms completed by reviewing physicians.  Tr. 387.  Two of the RFC forms dated October 20, 2008, and January 30, 2009, found Taylor capable of occasionally lifting 20 pounds and frequently lifting 10 pounds, and able to sit and stand "and/or walk" for six hours with regular breaks.  Tr. 1267 (J. Scott Pritchard, DO), 1321 (Neal E. Berner, MD).  That lifting restriction is consistent with the chiropractor's lifting restrictions in 2004.  Tr. 179-82.  This objective medical evidence seemingly contradicts Paulus's testimony that Taylor could lift no more than 10 pounds and his parents' testimony that any amount of walking made him sick to his stomach.  However, a closer analysis reveals no such contradiction.

Paulus described Taylor's lifting capability in October 2005.  Taylor improved after that date, especially in his upper back, to the point of returning to work for a few months in late 2006 and early 2007.  Tr. 22, 27-28.  However, he had to stop work due to increasing low back pain which did not improve despite treatment.  Tr. 22.  He also had foot surgery in November 2008.  Tr. 858-61.  By March 2010, as described by both Paulus and Taylor's parents, Taylor was suffering much worse pain in his low back despite physical therapy and medication.  Neither Dr. Pritchard nor Dr. Berner had the benefit of those 2010 descriptions.  More importantly, the ALJ expressly rested his reasoning on to the lack of support from "treating providers."  The RFCs were based solely on a review of the medical records, and were not issued by treating providers.

The ALJ's superficial handling of the lay testimony is particularly troublesome because this case was remanded with explicit instructions to update the medical record and "reevaluate

the lay witness statement from Denise Paulus." Tr. 445-46.  The ALJ considered Paulus's statements "credible to the extent reports of what has been seen and heard are accurate."  Tr. 388. Although all of her statements were based on what she had seen and heard since 2005 and were confirmed by the other lay witnesses, the ALJ completely failed to explain which of her observations were not accurate and why.  Instead, he vaguely referred to a lack of support in the medical evidence from the treating providers without pointing to anything specific in their records.  He gave even shorter shrift to the parents' observations.  Not only did the ALJ use the word "support" which is legally insufficient under *Bruce*, rather than "contradictory," but also the record lacks substantial evidence of any inconsistency between the lay testimony and the medical evidence from the treating providers.

The Commissioner also points out that the ALJ may reject lay testimony predicated upon reports of a claimant properly found not credible.  *Valentine v. Astrue*, 574 F3d 685, 694 (9th Cir 2009).  Thus, she urges this court to infer that the ALJ meant that the lay testimony was entitled to no more credibility than Taylor's own which the ALJ also found not credible.  However, this court "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision."  *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F3d 1050, 1054 (9th Cir 2006) (citation omitted).  The ALJ's only stated reason for rejecting the lay testimony was that it lacked medical support, and that is the only reason that this court may consider.

## III.    Taylor's Credibility

Taylor also challenges the ALJ's conclusion that the "intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent" with the RFC. Tr. 384.

///

A.    **Legal Standards**

The ALJ must consider all symptoms and pain which "can be reasonably accepted as consistent with the objective medical evidence and other evidence."  20 CFR §§ 404.1529(a), 416.929(a).  Once a claimant shows an underlying impairment which may "reasonably be expected to produce pain or other symptoms alleged," absent affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for finding a claimant not credible.  *Lingenfelter*, 504 F3d at 1036, citing *Smolen*, 80 F3d at 1281.  The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony."  *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th Cir 1991) (*en banc*).  A general assertion that the plaintiff is not credible is insufficient; the ALJ "must state which [subjective symptom] testimony is not credible and what evidence suggests the complaints are not credible."  *Dodrill*, 12 F3d at 918.  The ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant.  *Id.*

Examples of clear and convincing reasons include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistent statements, daily activities inconsistent with the alleged symptoms, a sparse work history, or testimony that is vague or less than candid.  *Tommasetti v. Astrue*, 533 F3d 1035, 1040 (9th Cir 2008).  Inconsistencies in a claimant's testimony, including those between the medical evidence and the alleged symptoms, can serve as a clear and convincing reason for discrediting such testimony.  *Burch v. Barnhart*, 400 F3d 676, 680 (9th Cir 2005); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F3d 595, 599 (9th Cir 1999).  Failure to seek medical treatment is also a clear and convincing reason to reject a claimant's

subjective statements.  *Burch*, 400 F3d at 681; *Fair v. Bowen*, 885 F2d 597, 603-04 (9th Cir

1989); *see also* SSR 96-7p, 1996 WL 374186 (July 2, 1996).

Credibility determinations are within the province of the ALJ.  *Fair*, 885 F2d at 604,

citing *Russell v. Bowen*, 856 F2d 81, 83 (9th Cir 1988).  Where the ALJ has made specific

findings justifying a decision to disbelieve an allegation of excess pain, and those findings are

supported by substantial evidence in the record, the role of the reviewing court is not to second-

guess that decision.  *Id.*

### B.  Testimony

At the first hearing in 2008, Taylor testified that since his car accident he had constant

pain in his lower back, numbness in his right leg that was migrating to his left leg, tendonitis in

his elbows and wrists, and cramping in his feet.  Tr. 24-25.  The pain in his lower back was 7 on

a 1-10 scale before taking medication which reduced his pain to 5.  Tr. 25-26.  The tendonitis

caused inflammation after tasks requiring gripping, pulling, or lifting with his hands.  Tr. 26.  As

a result, he was not able to lift small items.  Tr. 27.  He could only sit for 15-20 minutes before

his right leg starts to feel numb, stand for 15-20 minutes before experiencing a muscle spasm in

his lower back, and walk "a half a block to a block" before needing to rest to relieve the pain in

the right side of his body.  Tr. 30-31.  After sitting and standing for more than 15-20 minutes, he

had to stand up and "try to keep shifting positions."  Tr. 30.  He needed to rest 15-20 minutes

between long periods of standing, bending over, or repetitive movements.  Tr. 32.  These

restrictions limited his ability to do daily household chores like dishwashing, vacuuming, and

meal preparation.  Tr. 32-33.  The pain also limited his driving to three times a week.  Tr. 37-38.

Taylor's pain medication exacerbated his trouble with concentration.  Even after taking a

"normal dose," he experienced blurriness in his eyes as a side effect of the drug.  Tr. 26.

Taylor admitted smoking marijuana in high school and inquiring about medical marijuana as an alternative to Percocet.  Tr. 34.  He also testified that he drank socially when not taking pain medication and sometimes drank more than he should.  Tr. 35.  However, he denied that he drank eight beers a day and estimated his weekly intake to be half a case.  *Id.*  Taylor explained that on some days, he did not take his pain medication because he had already taken a larger dose than prescribed and ran out before the refill date.  Tr. 35-36.

At the 2010 hearing, Taylor testified that he was taking an average of six, and never less than six, Percocet pills per day.  Tr. 417.  In 2009 he could only walk a block or block-and-a-half before having to rest to relieve the pain.  Tr. 419.  During that time, he could not sit long and not without "constantly shifting [his] weight" to relieve the pressure off his back that caused pain in his right leg.  *Id.*  That shifting disrupted his concentration.  *Id.*  Picking something off the floor required Taylor to "basically kind of like squat" while holding "on to a counter or something." Tr. 420.

When asked about drinking alcohol in 2009, he explained that he drank "during football." Tr. 418.  At the time of the 2010 hearing, he would have a few beers while watching football games with friends, but did "not drink with the Percocet."  *Id.*

### C.    <u>Analysis</u>

The ALJ found that Taylor's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but "the intensity, persistence and limited effects of those symptoms are not credible to the extent they are inconsistent with the above [RFC]." Tr. 384.  Because the record contains no evidence of malingering, the ALJ was required to provide specific, clear, and convincing reasons to reject specifically identified portions of Taylor's testimony.

Taylor takes issue with the ALJ's boilerplate language as failing to "specifically identify the testimony she or he finds not to be credible." *Holohan v. Massanari*, 246 F3d 1195, 1208 (9th Cir 2001); *see also Dodrill*, 12 F3d at 918 (It is "not sufficient for the ALJ to make only general findings; he must state which pain testimony is not credible and what evidence suggests the complaints are not credible."). Although the ALJ did not add the words "for the reasons that follow," he then proceeded to explain why he concluded that Taylor's statements as to the extent of his symptoms were not credible. Tr. 384-88. In other words, he first stated the general finding, then articulated the specific reasons for the finding. That is sufficient, especially when the RFC excludes nearly all of Taylor's testimony regarding his symptoms.

The critical issue is whether the ALJ provided clear and convincing reasons to reject Taylor's testimony as to the extent of his symptoms. After stating that Taylor's testimony is not credible to the extent it is inconsistent with the RFC, the ALJ gave at least two specific reasons, namely that "[n]o treating or examining physician opined that the claimant is disabled or has more limitations than those determined in this decision" (Tr. 384) and that Taylor's "use of controlled substances raises concerns about his credibility." Tr. 386.

As part of the first reason, the ALJ identified medical evidence that Taylor's pain and limitations decreased with treatment immediately after the accident. First, the ALJ referenced Dr. Bieberach's notes from October 2004 that Taylor was in no acute distress following two months of chiropractic treatment after the accident. Tr. 384. Dr. Bierberach had reported that Flexeril was helping with his sleep and Naprosyn provided "minimal pain relief." Tr. 385. Second, the ALJ referenced the chiropractor's limiting instructions in late 2004 that allowed Taylor to lift more than five more pounds than the RFC. *Id.* Third, the ALJ referenced Taylor's reports of decreased pain during the period of 2005-2007. *Id.* In June and again in September

2005, Dr. Bierberach noted that Taylor reported less pain and stiffness in his neck and upper

back. *Id.* During the September 2005 visit, Taylor declined an epidural injection for treatment.

*Id.* In May 2007, Taylor reported "some relief from an epidural steroid injection." *Id.*

However, these portions of the medical record primarily concern Taylor's positive

response to treatment immediately after the accident and for his upper back and neck pain. They

do not discredit his testimony about consistent low back pain and radiating leg pain. While

Taylor's upper back and neck pain subsided over time, his low back pain increased. As the ALJ

also noted, in June 2005 Taylor reported "new symptoms of lower back pain." *Id.* And even

though Taylor rejected the offer of an epidural treatment in September 2005, he accepted one in

May 2007. *Id.* By 2008, Dr. Lee reported Taylor was experiencing significant pain from

"chronic low back and right leg problems." Tr. 385. Taylor continued to receive treatment from

epidural injections in 2008 and 2009. *Id.* Thus, evidence that Taylor's upper back and neck pain

improved with treatment is not a clear, convincing reason for discrediting Taylor's testimony

regarding the intensity of his lower back pain.

The ALJ also cited Taylor's failure to comply with prescribed exercise and diet regimes

by referencing Dr. Wachsmuth's notation on December 31, 2009, about Taylor's "lack of

adherence to the [treatment] plan." Tr. 385, 734. Also during that visit, Dr. Wachsmuth stressed

the importance of physical therapy to his recovery and requested that Taylor inform his doctors if

he elected to change his treatment. Tr. 734. The ALJ characterizes Dr. Wachsmuth as

"observ[ing] that the claimant was not following a physical therapy program." Tr. 385.

However, Dr. Lee referred Taylor to physical therapy on November 3, 2009, only two months

before his visit with Dr. Wachsmuth. On January 7, 2010, a week after receiving

Dr. Wachsmuth's warning, Taylor returned to physical therapy. Tr. 729. Taylor received

physical therapy in March and April 2009 to rehabilitate his ankle, and his Taylor's physical therapists reported his adherence to the home exercise plan ("HEP") and other treatments.  Tr. 964.

The ALJ also represented that "[w]ithout telling his doctors, the claimant had stopped using the fentanyl pain patch and was taking Percocet again."  Tr. 385.  While Taylor did not tell Dr. Wachsmuth that he had stopped using the Fentanyl patch (Tr. 735), he did report on December 18, 2009, that the patch decreased his functioning because it was too strong.  Tr. 739.  And the ALJ misrepresented Taylor as secretly self-medicating with Percocet when, in fact, he had a prescription and reported his daily use to Dr. Wachsmuth.  Tr. 739 (3-5 Percocet daily).

The ALJ also criticized Taylor's alleged need to use a cane based on "no evidence that [he] had a prescription for this cane, as no treating provider has limited [his] walking."  Tr. 386.  The ALJ "may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence."  *Lester v. Chater*, 81 F3d 821, 834 (9th Cir 1995).  The ALJ's reliance on the absence of prescribed limitations is unconvincing because in April 2009, Dana Bailey, PT, instructed Taylor to continue treating his ankle pain with a cane.  Tr. 833.  Also, Taylor's testimony about his walking restrictions is consistent with his reports to medical providers.  On March 10, 2010, a physical therapist noted Taylor was still experiencing "constant low back pain worse at time with prolonged standing or walking" and "has been using a cane" to supplement physical therapy.  Tr. 957.

Finally, the ALJ found that the Taylor's "use of controlled substances raises concerns about his credibility."  Tr. 386.  This statement is followed by several references to alcohol use, but alcohol is not a controlled substance.  The ALJ also mentioned Taylor's use of marijuana, but only when stating that "Dr. Levine's recommendation as of January 2008 was to lose weight,

exercise more, change his diet, and stop using marijuana."[5]  *Id.*  The ALJ did not explain how marijuana use affects Taylor's credibility.

The Commissioner argues that the ALJ included Taylor's drinking habits as evidence of his inconsistent statements.  But the ALJ's opinion actually states that Taylor's "use" of alcohol, not the inconsistency in describing his use, "raises concerns about his credibility."  Tr. 386. The court is "constrained to review the reasons the ALJ asserts," *Connett v. Barnhart*, 340 F3d 871, 874 (9th Cir 2003), and "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision."  *Stout*, 454 F3d at 1054.

Even if the ALJ had stated that Taylor's admission of drinking eight beers a day when not taking Percocet was inconsistent with his daily Percocet use, the record contains no substantial supporting evidence.  On August 6, 2007, Dr. Levine noted that Taylor drank approximately eight beers a day when not taking the Percocet.  Tr. 1048.  At the first hearing, Taylor denied making this statement and testified that his intake was half a case a week.  Tr. 35.  That testimony is consistent with the notes of David Gostnell, PhD, dated October 13, 2008, that Taylor reported drinking "three to four beers every couple of days, but he stopped drinking alcohol and he began using Percocet for his pain."  Tr. 1261.

Moreover, it is not clear from the record that Taylor was taking Percocet at the time of his admission to Dr. Levine.  Dr. Levine's notes from around the time of that visit do not refill the Percocet prescription (Tr. 1047-66), and, three months earlier, Dr. Jacobs noted that Taylor "manages his pain using flexeril and almost daily percocet and has been on a contract with Dr. Levine but hasn[']t gotten refills since January."  Tr. 1052.  On February 21, 2008, Dr. Lee reported Taylor was taking Flexeril and Percocet "only once in awhile" for the pain.  Tr. 1020-

---

[5]  Later in his opinion, the ALJ included Taylor's statement to Dr. Gostnell in October 2008 that "he occasionally smoked marijuana and had a medical marijuana card" (Tr. 387), but did not link that statement to the credibility determination based on "use of controlled substances."

21.  Thus, the medical record supports Taylor's statement that he did not drink alcohol while taking Percocet.

Overall, the ALJ failed to give specific, clear, and convincing reasons for discrediting Taylor's testimony.  Instead, it appears that he felt Taylor was inappropriately self-medicating to control his pain with alcohol, marijuana and narcotics, rather than through physical exercise and weight loss, resulting in his alleged mental and physical impairments.  Without specific evidence in the record to support such a conclusion, the ALJ committed legal error.

## IV.  <u>Remand</u>

Taylor argues the court should remand the ALJ's decision for an immediate award of benefits.  The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court.  *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir 2000), *cert denied*, 531 US 1038 (2000).  The issue turns on the utility of further proceedings.  A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision.  *Strauss v. Comm'r of Soc. Sec. Admin.*, 635 F3d 1135, 1138 (9th Cir 2011).

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited."  *Id*.  The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision.

*Connett v. Barnhart*, 340 F3d at 876, citing *Bunnell*, 947 F2d at 348.  The reviewing court declines to credit testimony when "an outstanding issue" remains.  *Luna v. Astrue*, 623 F3d 1032, 1035 (9th Cir 2010).

The ALJ erred in rejecting the lay witness and Taylor's testimony which should be credited as true.  Based on Paulus's testimony that Taylor can only lift 10 pounds and on Taylor's and his parents' testimony about his walking, sitting and standing limitations, Taylor can only engage in sedentary work.  Tr. 110; 20 CFR § 404.1567(a).  However, based on the need for limited public contact, the VE eliminated Taylor from being able to perform unskilled, sedentary work.  Tr. 434.

In addition, the testimony of Taylor and the lay witness supports his inability to handle stress, concentrate, and perform simple tasks due to his pain and narcotic pain medication.  The ALJ asked the VE how an individual's inability to maintain concentration, persistence, and pace on a consistent basis would interfere with the maintenance of competitive employment.  Tr. 435.  The ALJ also asked about the effect of an individual requiring reinstruction on a task two or three times a day because of lack of concentration.  Tr. 436.  The VE testified that, were those limitations included in the RFC, Taylor could not be competitively employed.  *Id.*  Thus, when properly credited and combined with the VE's testimony, testimony by Taylor and the lay witnesses establishes that Taylor is not capable of competitive employment.

As for the other two steps in the *Harman* inquiry, this court finds that outstanding issues need not be resolved before a determination of disability can be made, and that the record is clear that the ALJ would be required to find Taylor disabled if the evidence is credited.  The parties also dispute whether the apparent confusion about the alleged onset date of Taylor's disability is

grounds for remand.  However, Taylor is correct that the record supports a disability finding

under both dates such that no further administrative hearing is necessary.

## **<u>ORDER</u>**

For the reasons stated above, the Commissioner's decision is REVERSED and

REMANDED for an award of benefits.

DATED March 10, 2014.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge